UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES STUDENT
ASSOCIATION FOUNDATION, as an
organization and representative of its          Case No. 2:08-cv-14019
members; AMERICAN CIVIL LIBERTIES
UNION FUND OF MICHIGAN, as an               HONORABLE STEPHEN J. MURPHY, III
organization and representative of its
members; and AMERICAN CIVIL
LIBERTIES UNION OF MICHIGAN, as an
organization and representative of its
members,

          Plaintiffs,

v.

TERRI LYNN LAND, Michigan Secretary of
State; CHRISTOPHER M. THOMAS,
Michigan Director of Elections; and
FRANCES MCMULLAN, City Clerk for the
City of Ypsilanti, Michigan, in their official
capacities,

          Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

          This lawsuit involves a challenge to the State of Michigan's election practices.

The plaintiffs initiated the case by filing a complaint on September 17, 2008, and

simultaneously requested both the entry of a preliminary injunction and expedited hearing

of the matter. The defendants filed a brief opposing the plaintiffs' motion for preliminary

injunction on September 26, 2008, and the plaintiffs filed a reply brief on September 29,

2008. All three of these filings exceeded the page limitations for such pleadings and in all

three instances, the Court granted motions to exceed page limits. All filings have been

supported by voluminous attachments and exhibits.

The Court held a lengthy hearing on the motion for preliminary junction on September 30, 2008. None of the defendants have filed an answer to the complaint.

<u>INTRODUCTION</u>

The plaintiffs challenge two separate practices of the defendants, all of whom are Michigan election officials.  Each of the challenged practice involves the marking of voter registrations as "rejected" or "cancelled." The plaintiffs first challenge the Michigan Secretary of State's practice of cancelling voter registrations of Michigan voters who apply for driver's licenses in other states.  Secondly, they object to a Michigan statute requiring the automatic "rejection" of new registrations if, after the state mails a voter ID card to the address provided on the voter's application, the card is returned by the post office as undeliverable to that address.  The plaintiffs challenge these practices as forbidden by certain provisions of the constitution and by various state and federal statutes. The facts of the matter are largely undisputed.

<u>FACTS</u>

I.  <u>Background – Michigan's Voter Registration Regime</u>

Michigan's statewide voter registration database is known as its Qualified Voter File ("QVF"). Local clerks and employees in the Michigan Department of State process completed voter registration application forms by entering the potential voter's name and other information into the QVF.  Shortly thereafter, the official prints and mails a voter identification card to the potential voter.  Subsequently, the Department of State generates local voter lists from the QVF.  These are used by local election officials on election day to determine whether persons appearing at the polls are registered to vote.

A voter's registration in the QVF may have one of several status marks or labels attached to it.  The default status for a registration is "active," meaning that there are no

further administrative obstacles to a registrant being able to vote. If, however, a potential voter's registration materials are deemed insufficient, the voter's information will nonetheless be entered into the QVF, but can be marked as "rejected." Similarly, when a voter is determined to be no longer eligible, his or her registration record is retained in the QVF, but marked as "cancelled." Because the names of voters whose registrations are marked as "rejected" or "cancelled" will not appear on precinct lists generated from the QVF, these voters will not be permitted to cast regular ballots if they appear at the polls on election day in Michigan unless they can produce an original receipt of their voter registrations.

The QVF also permits registrations to be marked as "verify" or "challenged" without being entirely cancelled. These markings allow the registrant's name to appear on the precinct lists generated from the QVF, but will appear on those lists as directions to local poll workers to require various forms of confirmation of the voter's eligibility before permitting a vote to be cast. Thus, on a precinct list, a marking of "verify" next to a voter's registration requires the voter to provide some sort of verification of eligibility before casting a ballot. *See, e.g.,* M.C.L. § 168.509aa (requiring voter to affirm residence at polls if voter fails to respond by 30 days before election to notice that local clerk received "reliable information" that voter has moved out of jurisdiction). Similarly, a marking of "challenge" next to a voter's name seems, under the statute, to require that a more stringent assessment of a voter's eligibility be conducted at the polls. *See* M.C.L. § 168.509cc.

II. The Challenged Practices

    A. "Rejection" of registrations when the voter's ID card is returned as undeliverable.

As noted, after a potential voter's registration information is received and entered into the QVF, the system generates a voter ID card that is mailed to the voter. If, however, an

original voter ID card is returned by the United States Postal Service as being undeliverable to the address listed on the registration, M.C.L. § 168.449(3) requires the clerk to "reject the registration and send the individual a notice of rejection." *See also* M.C.L. § 168.500c (person whose original voter ID is returned as undeliverable "shall be deemed not registered under this act.") As a result, the name of an applicant whose voter ID card is returned as undeliverable will not appear on the local voter rolls. When a registration is "rejected" in this manner, the city or county clerk sends out a notice of rejection to the voter. The notice of rejection is accompanied by a reply card that offers the potential voter a chance to complete his or her registration by correcting the address information, or by another version of the card that simply states the necessity of re-registering should the recipient wish to vote. In this opinion, the Court will subsequently refer to this sequence as the "undeliverable ID practice." The Court finds that from January 1, 2008, until September 25th, 2008, the State of Michigan "rejected" 1,438 voter registration applications as a result of the undeliverable ID practice. Thomas aff., docket no. 15 ex. A, at ¶ 6.

This practice described above differs from the procedures required by M.C.L. § 168.449(3) when a *duplicate* voter ID card is returned as undeliverable. In that case, the local clerk is directed to provide a voter with an opportunity to confirm or correct the voter's address. Even if the voter fails to confirm or correct the address, the registration will not be cancelled, but marked by a precinct worker as "verify" or -- if the address confirmation form is also returned as undeliverable -- as "challenged." *See* M.C.L. 168.509aa(3) and (4) (explaining procedures required by § 168.449(3)).

B. Cancellation of registrations on the voter's
   <u>application for a driver's license in another state</u>.

In addition to managing the state's voter rolls, the Michigan Secretary of State also has authority over Michigan driver's license records.  Since most states require an applicant for a driver's license to surrender any license the applicant holds from another state, at the time of application the Secretary regularly receives records of surrendered Michigan driver's licenses from her counterparts in other states.  At issue in this case is the Secretary's specific practice of cross-referencing the numbers on surrendered licenses against the driver's license numbers listed in the state's QVF, and then marking any matching voter registrations as "cancelled."[1]  *See* Thomas aff., docket no. 15 ex. A, at p. 30.  The sequence described in this paragraph will subsequently be referenced in this opinion as the "driver's license practice."

When a match of the sort described above occurs, a local clerk must send to the affected voter a reply card that permits the affected voter to state that his or her absence from Michigan is only temporary and that he or she remains register to vote.  If the voter makes an affirmation of this sort, the voter's registration is returned to "active" status by the Secretary.  The reply card also states that "[i]f the reply card is not returned, you will be asked to confirm your address at the polls on Election Day.  If the reply card is not returned and you do not vote within 30 days, your voter registration will be canceled."[2]

---

[1]  It is not clear to the Court whether this practice is required by state law.  M.C.L. § 168.500h requires the Secretary to conduct the cross-check process and to notify local clerks of the results. The statute further provides that a  match "shall constitute reliable information that the registered elector has removed from the municipality."  *Id.* But the statutory section's only directive to local clerks is to "proceed in compliance with section 513," *id.*, a section that has been repealed. Regardless of whether the practice is required, there is no dispute between the parties that the Secretary actually is directing cancellations in this manner.

[2]  The language quoted here from the reply card does not appear to be accurate, since at the time of receipt of the card the voter's registration has already been cancelled. But this apparent inaccuracy does not underlie the plaintiffs' challenge to the practice.

ANALYSIS

I.    Plaintiffs' Legal Challenges

The plaintiffs assert a wide variety of legal theories in support of the unlawfulness of the two practices governing voter registrations in which Michigan engages. The heart of the plaintiffs' legal attack, however, is grounded in Section 8 of the National Voting Rights Act (the "NVRA," or "Act"), codified at 42 U.S.C. §§ 1973 *et seq.*  More specifically, subsection 1973-gg(6)(d) of the Act states the exclusive procedures by which a state may "remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence."  Removals are permitted only in two situations:  The first situation in which a registered voter can be removed from the rolls is when a registrant confirms the disqualifying address change in writing.   42 U.S.C. § 1973gg-6(d)(1)(A).  The second situation occurs when (a) the state sends the registrant, by forwardable mail, a postage-prepaid return form by which the registrant can update his address information, and (b) the registrant neither returns the form nor votes or appears to vote in the next two general elections for Federal office.  *Id.* at § 1973gg-6(d)(1)(B).

The plaintiffs claim that both the undeliverable ID practice and the driver's license practice are deregistrations of registered voters on the basis of a change in residence, within the meaning of the NVRA.  If their characterizations are accurate, it follows that the practices violate the NVRA, since the defendants -- throughout the short history of this litigation -- have conceded that the procedures provide neither the notice nor the waiting period mandated by 42 U.S.C. § 1973gg-6(d). The plaintiffs therefore seek a declaration that the practices are unlawful, and request that the Court enjoin the defendants to cease the practices, to restore to the rolls all registrants marked "rejected" or "cancelled" pursuant

to the practices since January 1, 2006, and to preserve all records related to such cancellations until the end of 2009.

II. <u>Standing to Sue</u>

One overriding and threshold issue is whether the plaintiffs have standing to sue. Although the defendants have not moved for dismissal based on lack of standing, both sides raise the issue in their briefs on the instant motion and the Court provided counsel ample opportunity to address the matter during oral argument. All parties surely recognize that "[b]ecause the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F. 3d 598, 607 (6th Cir. 2007). The Court therefore addresses standing here.

A. <u>The Legal Standard</u>.

To demonstrate the existence of a case or controversy of the kind that a federal court is constitutionally authorized to hear, a plaintiff must show that "'(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Cleveland Branch, NAACP v. City of Parma*, 263 F. 3d 513, 523-24 (2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)).

Here, the plaintiffs are not natural persons, but instead associations of persons. "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F. 3d 536, 544 (6th Cir. 2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). Further,

regardless of whether an association of persons would not have standing based on its organizational interests, it will be able to sue as a representative of its membership "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Cleveland Branch,* 263 F. 3d at 524 (quoting *Friends of the Earth,* 528 U.S. at 181 (2000)).

B. Level of Showing Required.

"Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoted in *Sault Ste. Marie Tribe of Chippewa Indians v. U.S.*, 288 F. 3d 910, 915 (6th Cir. 2007)). Thus, in those cases when a defendant moves for dismissal based on a plaintiff's lack of standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Kardules v. City of Columbus*, 95 F. 3d 1335, 1346 (6th Cir. 1996) *(*quoting *Warth v. Seldin*, 422 U.S. at 501). In this *sua sponte* inquiry, the Court will apply the standard stated above and further notes that under the standard, if the allegations in the complaint do not establish standing, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of the plaintiff's standing." *Warth*, 422 U.S. at 501. It is only at trial that a plaintiff bears the burden of *proving facts* supporting standing, along with the elements of its case. *Lujan*, 594 U.S. at 56.

The plaintiffs in the present suit claim that they have adequately alleged facts supporting their standing, both in their own rights and as representatives of their members. The Court will first explain why the plaintiffs have not alleged a sufficient injury to their organizational interests to have standing in their own rights, and then set forth the reasons for the Court's conclusion that the plaintiffs have standing to sue as representatives of their members.

C. Injury In Fact.

1. The Legal Standard.

A person who has actually been harmed or faces certain future harm obviously presents the kind of injury in fact required for standing to sue the party by whom he or she was or will be injured. But, as plaintiffs note, even a likelihood of future harm, which may or may not materialize into actual injury for the plaintiff, qualifies as an injury in fact for purposes of standing analysis. This principle has been repeatedly applied in election-law cases decided by the United States Court of Appeals for the Sixth Circuit and various lower courts within it.

*Sandusky County Democratic Party v. Blackwell*, 387 F. 3d 565 (6th Cir. 2004) involved, among other things, a challenge to Ohio's requirement that a poll worker determine that a voter of questionable eligibility was at the correct precinct polling place before being permitting the voter to cast a provisional ballot. *Id.* at 571. The plaintiff organizations argued that human errors in compiling the rolls, or in determining whether a given voter's name was on them, could result in some of their members mistakenly being wrongfully denied the right to vote on this basis. Since these mistakes could occur up to the moment a voter was turned away from the polls, however, they plaintiffs could not beforehand which if any of their members would actually be disenfranchised in this fashion.

Nevertheless, the Sixth Circuit held that they had standing based on the increased risk of disenfranchisement faced by all their members as a result of the "inevitable . . . mistakes" of poll workers. *Id.* at 574.

Other cases have adopted similar reasoning. In *Stewart v. Blackwell*, 444 F. 3d 843 (6th Cir. 2006), *vacated as moot*, 473 F. 3d 696 (6th Cir. 2007), the Sixth Circuit found several individual plaintiffs to have standing to claim that the punch-card voting machines used at their polling places were unlawfully unreliable, again on a theory that each plaintiff faced an increased risk of having her vote counted improperly as a result of the alleged unreliability. Although the judgment in that case was vacated as moot when Ohio abandoned the use of the machines in question, its reasoning on the standing issue is fully consistent with that of *Sandusky County*.

Two cases decided by the district courts have also applied this standard as well. In both *Summit County Democratic Central and Executive Committee v. Blackwell,* No. 5:04CV2165, 2004 WL 5550698 (N.D. Ohio Oct. 31, 2004), and *Spencer v. Blackwell*, 347 F. Supp. 2d 528 (S.D. Ohio 2004) district judges found the plaintiffs to have standing to sue based on the risk that they would be wrongfully disenfranchised by Ohio's laws permitting at-the-polls challenges to voters' qualifications.

To establish representative standing in this case, then, the plaintiffs must plead that at least one of their members either actually has been or will be wrongfully disenfranchised by each of the complained-of practices, or that they face some risk of disenfranchisement. By contrast, to establish standing in their own right, the plaintiffs must plead that such wrongful disenfranchisements, or the risks thereof, have harmed them as organizations in some concrete and meaningful way. Under either theory, plaintiffs' standing will ultimately

have to be grounded in the deprivations of voting rights caused by the Secretary's allegedly unlawful practices.

## 2. Standing as organizations.

The plaintiffs claim that they have alleged sufficient harm to their organizations as a whole to have standing in their own rights. Each of the plaintiffs claims an interest in politically empowering the communities they serve, which interest they further by, among other things, conducting voter registration drives. Compl. at ¶¶ 2-3. Nevertheless, "a mere interest in a problem is not . . . sufficient to confer standing on an organization." *Greater Cincinnati Coalition for the Homeless v. Cincinnati*, 56 F. 3d 710, 716 (6th Cir. 1995) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). Instead, the plaintiffs must show that their organizations themselves, as opposed to the ideals they pursue, have suffered some kind of concrete harm as a result of the alleged disenfranchisement. To take the most obvious example, if the plaintiffs' expenditures of time and money on voter registration drives have been rendered a waste in any significant measure because the voters they registered at those drives were unlawfully taken off the rolls, that would be sufficient injury to confer standing.

Here, though, the plaintiffs have alleged that some of their members are among the voters who face disenfranchisement, but do not allege, either expressly or by implication, that they as organizations had any concrete involvement in the registration of those voters. Even if the organizations had actually registered such voters, the complaint cannot fairly be read to allege that the number of such disenfranchisements was great enough to have had the required impact upon the organization's interests as a whole.[3] Nor have the

---

[3] Of course even a single disenfranchisement would support standing for the disenfranchised person to sue as an individual, or for an organization to which he or she belonged to sue in a representative capacity. That is why, as the Court will explain below, the plaintiffs have pleaded

plaintiffs alleged in any other way that the disenfranchisements harm their concrete organizational interests, as opposed to the organizations' more abstract social goals. Therefore, in the view of the Court, in order to proceed on a theory of organizational standing the plaintiffs would be required to amend their complaint to include more specific allegations as to the nature and manner of the harm or potential harm to their organizations.

    3.  <u>Standing as representatives of the plaintiffs' members</u>

The plaintiffs additionally claim standing not just as organizations, but as representatives of their members who individually face disenfranchisement. Attacking this claim, the defendants argue that the plaintiffs have not identified any individual, much less one of their members, who they claim to have been harmed by the practices of which they complain. The plaintiffs have, however, pleaded the *existence* of such persons among their membership. Specifically, paragraphs 73 and 88 of the complaint allege that the out of state driver's license application and undeliverable ID practices, respectively, "present[] the real and immediate threat that such members will be disfranchised." Compl. ¶¶ 73, 88. While these allegations are conclusory, in light of the plaintiffs' other allegations, and "constru[ing] the complaint in favor of the complaining party," *Kardules v. City of Columbus*, 95 F. 3d 1335, 1346 (6th Cir. 1996), the facts required for standing follow from these claims by necessary implication.

With respect to the undeliverable ID card practice, paragraph 73 can fairly be read as a claim that some of plaintiffs' members have recently registered to vote, but have not yet received their voter ID cards -- so as to be at risk of wrongful disenfranchisement if human error causes them to be returned as undeliverable. The paragraph can also be read to

_____

facts establishing representative standing in this case.

claim that other of plaintiffs' members have actually been wrongfully removed from the rolls pursuant to this practice, and will almost certainly be denied the right to vote in the upcoming election.

With respect to the out of state driver's license application practice, paragraph 88 necessarily implies that some of plaintiffs' members have applied or are currently planning on applying for out-of-state driver's licenses without actually surrendering their Michigan residence. The paragraph also implies that some of plaintiffs' members have indicated or plan to indicate on their applications that their listed address is not for voter-registration purposes, and that they were or will be unable or unwilling to return the reply card from the state in time to be restored to the active status.

Thus, once the logical implications of the sparse language of the complaint are considered, the Court concludes that it satisfies -- just barely -- the requirement of alleging injury in fact to the plaintiffs' membership, so as to support representative standing to challenge both practices at issue here.

D. <u>Causal Connection Between the Injury and the Challenged Practices</u>.

Michigan claims that any injury suffered by the plaintiff results not from the Secretary's adverse voter-registration actions, but rather from the actions of the voters which precipitate the Secretary's decisions. This argument is plausible, but without merit. With regard to the undeliverable ID practice, it does not appear that an eligible voter who gives his correct address could do anything differently to avoid the risk that his or her card would be misaddressed or misdelivered, and as a result returned as undeliverable. With respect to the out of state driver's license application practice, it is true that a voter's registration will not be cancelled if he or she does not apply for a license from another state, and thus that any disenfranchisement is, in a superficial sense, "caused" by that action. But it is equally

13

plausible to conclude that disenfranchisement may caused by the defendants' allegedly unlawful actions in cancelling the voter's registration. The Court divines no reason, and defendants offer none, why the first of these "causes" is the only one that should count in its analysis of the plaintiffs' standing to sue.

E. Redressability

Michigan argues against the redressability requirement on the sole ground that because its cancellation-notification and provisional-ballot procedures prevent any voters from actually being disenfranchised, there is no injury to redress. This argument is redundant of the argument the State makes in opposing a finding of injury in fact, and is addressed above in the Court's consideration of that element of the standing test. In other respects, it is clear that the disenfranchisement alleged by the plaintiffs will cease if, as plaintiffs request in this action, the defendants are ordered to stop rejecting and cancelling the relevant voter registrations, and restore registrations already rejected or cancelled. Therefore, the redressability requirement has been met in this case.

F. Additional Representative Standing Requirements.

The complaint states that the plaintiff United States Student Foundation has as "a cornerstone" of its activities "helping students make their voice heard at the ballot box, including through non-partisan voter registration drives," and that its "national electoral project focuses on building strong peer-to-peer student electoral coalitions and maximizing voter turnout among college populations." Compl. at ¶ 2. Likewise, the plaintiff ACLU Fund "is extensively involved in a variety of voter empowerment initiatives throughout Michigan, including voter education, collection and analysis of voting irregularities, advocacy for positive election reform, and -- when necessary -- litigation to ensure the protection of voters' rights under the law." *Id.* at ¶ 3. Disenfranchisement, the injury alleged here,

seems obviously germane to these organizational purposes, and the defendants do not contest this point.

Finally, participation by individuals "is 'not normally necessary when an association seeks prospective or injunctive relief for its members.'" *Sandusky Co. Democratic Party v. Blackwell,* 387 F. 3d 565, 574 (6th Cir. 2004) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 546 (1996)). In this matter, the defendants have not identified any need for individual participation, and the Court does not see the necessity for it in seeking the relief requested.

G. <u>Conclusion -- Standing to Sue</u>.

The plaintiffs have pleaded standing, as representatives of their members, to seek the relief they request. Should this case progress to trial, they will bear the additional burden of proving what they have pleaded in order to conclusively establish their standing to sue.

III. <u>Preliminary Injunction Motions</u>.

The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996). The Supreme Court and the Sixth Circuit have noted that "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). The Sixth Circuit, however, has advised that "a preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citation omitted).

When considering whether to grant the "extraordinary" remedy of a preliminary injunction, a district court must consider and balance four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the preliminary injunction; (3) whether issuance of the preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the preliminary injunction. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citations omitted). These "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (citation omitted). A district court must make specific findings concerning each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995); *Jones*, 341 F.3d at 476 (citations omitted) (a court "is not required to make specific findings concerning each of the four factors used in determining a motion for a preliminary injunction if fewer factors are dispositive of the issue.").

    A. <u>Likelihood of Success on the Merits</u>.

        1. <u>Lawfulness of the Practices</u>.

            a. <u>The undeliverable ID practice</u>.

The parties' dispute over the legality of the undeliverable ID practice essentially boils down to a disagreement over the meaning of the word "registrant," as it appears in the NVRA. As the Court noted earlier, when a voter's original voter ID card is returned to a local clerk as undeliverable, the clerk marks the voter's registration in the QVF as "rejected,"[4] without following the procedures mandated by the NVRA for removing voters

---

    [4] There apparently is no dispute that such a person has been "removed . . . from the official list of eligible voters" within the meaning of 42 U.S.C. § 1973gg-6(d)(1), despite the fact that his or her name remains listed in the QVF. The Court concludes that persons designated as ineligible to vote

from the rolls based on a change of address.[5]  The NVRA, however, provides that only "registrants" enjoy the protection of these procedures.  Plaintiffs therefore claim that a potential voter who sends in registration materials becomes a "registrant" under the NVRA as soon as a Department of State employee or a local clerk processes the materials and enters the voter's name into the QVF.  By contrast, the defendants argue that a potential voter's registration is actually not effective until the voter receives his or her voter ID card.  If the defendants prevailed on this point, the Court would have little option but to conclude that the undeliverable ID practice does not remove "registrants" from the rolls, because the potential voters whose registrations are marked "rejected" after their cards are returned as undeliverable would never have been registered in the first place.

The parties cite what appear to be dueling statutes to establish their respective positions on the issue of when a potential voter becomes registered to vote as a matter of Michigan law.  Defendants point out that M.C.L. § 168.500c states that a person whose original voter ID is returned as undeliverable "shall be deemed not registered."  In response, the plaintiffs rely upon M.C.L. § 168.509o(2), which provides that "[n]otwithstanding any other provision of law to the contrary . . . a person who appears to

---

have in fact been so removed, even if their registrations appear in the same document with voters who remain listed as eligible.  In any event, the precinct lists are also indisputably "official list[s] of eligible voters," and if a voter's registration has been rejected or cancelled, it is clearly removed when those lists are compiled from the QVF.

[5]  It could be argued that any removals of voters produced by the undeliverable ID practice are made on the grounds that the removed voters have never shown that they have a Michigan residence in the first place, rather than that they have moved away from the undeliverable addresses, and that § 1973gg-(d) therefore does not apply in this circumstance at all.  The defendants, however, do not make this argument, apparently because  failure to prove residence is not a permissible ground for removal under the NVRA. The Act provides that a registrant may be removed from the rolls based only on his own request, criminal conviction, mental incapacity, the voter's death, or the voter's change of residence.  42 U.S.C. § 1973gg-6(a)(3) and (4).  Thus, if the plaintiffs are correct that the undeliverable ID practice actually does remove already-registered voters, change of residence is the only possible ground for such removals under the NVRA, and the § 1973gg-6(d) provisions will govern the  removals.

17

vote in an election and whose name appears in the qualified voter file for that city, township, village, or school district is considered a registered voter."

The Court regards this dispute as largely irrelevant, however, because making the question of who is a "registrant" a matter of state law would frustrate the NVRA's purpose of regulating state conduct of elections, by essentially permitting states to decide when they will be bound by the Act's requirements. If Michigan can label potential voters who have not received their IDs as not "registered" under the NVRA, nothing is to stop it from attaching that same label to any other group of people, and thus from circumventing the procedures mandated by the NVRA whenever it sees fit. Instead, the Court concludes that whether a potential voter is a "registrant" entitled to the NVRA's protections is clearly a question of federal law, to be answered by a careful consideration of the substance of the potential voter's status in the state registration program in question.

Indeed, the plain language of the NVRA virtually dictates that a person be regarded a "registrant" within the meaning of that statute at the moment his or her name appears on "the official list of eligible voters." *See* 42 U.S.C. § 1973gg-6(d)(1).[6] In Michigan, as noted above, this list is the QVF (exclusive of registrations designated "rejected" or "cancelled") and the individual precinct rolls generated from it. Thus, the lawfulness of the undeliverable ID practice ultimately hinges on whether Michigan lists a potential voter as permitted to vote on the QVF as soon as it processes his or her registration application, without waiting to determine whether it will be returned as undeliverable. In other words, the central question

---

[6] Since the statute only governs when a registrant can be *removed* from the list of eligible voters, it could be construed in the strictest sense to permit a state never to place some or all of its "registrants" on that list in the first place. But this interpretation would have a similar effect of permitting states to follow NVRA removal procedures only when they saw fit, and thus of completely neutering those procedures. It is also theoretically possible that some persons whose names appear on the list of eligible voters are nevertheless *not* "registrants." The defendants here, however, make no such contention with respect to potential voters whose registrations were affected by the undeliverable ID practice.

is: if a potential voter's ID card were to be returned as undeliverable only *after* an election has intervened, would the voter's QVF status have permitted him or her to vote in that election in the meantime? At the hearing on this motion, counsel for the defendants represented that the answer to these questions is "yes." In fact, counsel stressed at the hearing that a potential voter whose ID is returned as undeliverable may nonetheless cast a regular ballot on election day if he or she presents a receipt of registration at the polls. Since the Court accepts these facts as true, the Court also concludes that a potential voter in Michigan is a "registrant" under the NVRA the moment the state processes his or her registration, and that the voter may only have his or her status changed to one that would not permit a valid vote (regardless of whether Michigan calls the change "rejection," "cancellation," or anything else) pursuant to the provisions of the statute.

In *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976 (W.D. Mich. 1995) (hereinafter "*ACORN*"), the court took a contrary view, and found Michigan's categorization of voters as registered or unregistered to be conclusive of the questions involved. In support of its position, the Western District of Michigan cited portions of the NVRA's legislative history reflecting a congressional desire to leave the states "discretion" to tailor their notification procedures to prevent fraud. *Id.* at 987 (quoting Sen. Rep. No. 6, 103d Cong., 1st Sess., at 30 (1993); H.R. Rep. No. 9, 103d Cong., 1st Sess., at 14 (1993), U.S. Code Cong. & Admin. News 1993 at 105, 118, 134). While such discretion is undoubtedly important, the terms of the NVRA, which the Court reads to be clear and unambiguous on the issue, say absolutely nothing about it. Moreover, the state's discretion can be appropriately preserved within the provisions of § 1973gg-6(d), without making its procedures entirely optional for any state in the union. Nothing prevents Michigan, for example, from creating a new "pending" voter registration status that will bar potential

voters from voting, and thus render them not NVRA "registrants," for a limited time after their information is added to the QVF, and providing that any registrations returned as undeliverable during that time will be rejected. What the state may *not* do and still act consistently with the NVRA is to place a potential voter's name on the QVF in a status that permits the registrant to vote, only to later mark the registration as "rejected" at a later date -- possibly even after the registrant has cast a vote. Because the defendants in this case appear to be doing precisely that, the Court concludes that the plaintiffs have shown a strong likelihood that the undeliverable ID practice violates federal law.[7]

      b. <u>The driver's license practice.</u>

The defendants concede that the driver's license practice involves cancelling voter registrations based on the voter's change on residence, such that 42 U.S.C. § 1973gg-6(d)(1) requires either written confirmation of the address change from the voter, or written notice to the voter followed by a waiting period of two federal elections. Defendants claim, however, that by applying for a driver's license in another state, a voter is confirming his or her change of residence in writing, in satisfaction of subparagraph (A) of that provision. In support of this contention, they cite another portion of the NVRA, codified at 42 U.S.C. § 1973gg-3(a). This subsection provides that:

      (1) Each State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State

---

    [7]   For this reason, it is for the most part unnecessary to reach the other asserted grounds for the unlawfulness of the undeliverable ID practice. Specifically, although M.C.L. § 168.509aa provides procedural protections similar to those of 42 U.S.C. § 1973gg-6(d), the Court expresses no view on the state-law question of who qualifies as a "voter" within the meaning of this statute, so as to be entitled to those protections. Since these procedures are redundant to those of the NVRA, it is irrelevant whether Michigan offers them to a narrower class of persons than those deemed "registrants" under federal law. In considering what relief is appropriate, therefore, the Court will briefly consider below the plaintiffs' claim that the Fourteenth Amendment and the Civil Rights Act, 42 U.S.C. § 1971(a)(2)(A), require that the registrants whose original voter IDs are returned as undeliverable be treated the same as those who have their *duplicate* IDs returned to the sender.

> law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application.
>
> (2) An application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant.

Further, subsection (d) of the same section provides that

> [a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

The plaintiffs urge that subsection (d) applies only to changes of address within a single state, and not to an original application for a driver's license in another state. This specific question has not been exhaustively briefed, and the Court will not decide it now. It does seem to the Court, however, that interpreting subsections (a) and (d) to *both* apply to an original driver's license application would create the potential that the two sections might mandate contradictory outcomes in some cases. Specifically, if an applicant for a driver's license signed a voter-registration application in conjunction with the driver's license paperwork, subsection (a)(2) would require this action to be considered an update to the previous voter registration. This would permit the address on the old registration to be replaced with the address on the new application -- indeed, such address updates would seem to be the main purpose of paragraph (2). But if subsection (d) were also to apply to the case, the applicant would additionally be able to indicate on the driver's license application that the change of address was *not* for voting purposes. Obviously, both of these mandates could not be simultaneously fulfilled. The easiest way to avoid potentially inconsistent outcomes such as these would be to accept the plaintiffs' invitation to interpret the phrase "change of address form" in subsection (d) as not including applications for an entirely new driver's license in a state where the applicant has not previously held a license.

Should the defendants prefer a different construction, they should propose some alternative solution to this problem -- and authority for their proposal -- as soon as possible.

Whatever the correct construction of subsection (d) may be, however, there can be little doubt that the out of state driver's license practice is violative of the NVRA. Even if out of state driver's license applications qualify as "change of address forms" under subsection (d), that very subsection still clearly requires states to ascertain whether the applicant has designated the application as *not* a change of address for voter registration purposes. The plaintiffs claim, and the defendants have not contradicted, that Michigan currently has no procedure for doing so. If, on the other hand, subsection (d) does not apply to driver's license applications, then subsection (a) would only permit the Secretary to cancel an applicant's Michigan voter registration if the applicant actually registered to vote in conjunction with the application. But again, there is no evidence that the current practices in place in the state of Michigan include any efforts, by the defendants or anyone else, to determine whether a voter actually does so.

The defendants claim that applying for a driver's license in another state is in fact confirmation of a change of address for voting purposes even if, as is permitted by the NVRA, the voter designates it otherwise. This is true, the defendants assert, because under the law of every state except Hawaii, only residents are permitted to apply for driver's licenses. As a result, they argue, no Michigan voter will be permitted to apply for a driver's license in another state without also confirming his or her residence in that state.

Even if the defendants' survey of state laws is correct, their conclusion is invalid for two different reasons. First, even if it is unlawful in almost every state to apply for a driver's license without being a resident there, it is dubious whether every person applying for a driver's license actually does confirm his or her residency in the state of application.

Defendants concede that fully eighteen states -- including Michigan's largest contiguous neighbor, Ohio -- have no requirement that a driver's license applicant actually prove residency. Response brief, docket no. 15, ex. A. Thus, the reality is that state driver's license application procedures permit some applicants, through ignorance of or even outright disregard for the law, to apply for driver's licenses in different states even while representing that their home address or domicile is still in Michigan. Although defendants' evidence indicates that this action is unlawful in most states, it still does not constitute written confirmation of an address change, and thus cannot justify the cancellation of an applicant's Michigan voter registration -- which in any event would be an illogical consequence for this particular form of lawlessness.

Second, and more importantly in the view of the Court, there is no reason to believe that the kind of "residence" that any given state requires in order to issue a driver's license is identical to "residence" for voting purposes. Unless it is at least possible for a person to have different addresses for his or her driver's license and voting residences, it would be nonsensical for the NVRA to permit a voter to change the former without also changing the latter. In fact, Michigan itself permits out-of-state driver's license applicants to retain their active status in the QVF by affirming that their out of state addresses are only temporary, and that they remains eligible to vote in Michigan. Thomas aff., docket 15 ex. A, at ¶ 11. Thus, even the state recognizes that voters can be eligible both to vote in Michigan and to apply for a driver's license in another state, and that the residence requirements for the two are not always identical. For all these reasons, then, and contrary to the defendants'

contention, the appearance of an out-of-state address on a driver's license application simply does not establish that the applicant is no longer an eligible Michigan voter.[8]

In their complaint and briefing on the instant motion, the plaintiffs essentially argued that every cancellation pursuant to the out of state driver's license practice was unlawful. As the foregoing makes clear, this argument is incorrect. 42 U.S.C. § 1973gg-3(a) permits such cancellations if a driver's license applicant also registers to vote in his or her new state, and, if it applies, subsection (d) of the same section permits such cancellations unless the applicant affirmatively opts out of them. At the hearing on the preliminary injunction motion, the plaintiffs narrowed their contentions to cover only cancellations precluded by one or both of these provisions The Court concludes, therefore, based upon all of the foregoing analysis, that the plaintiffs' legal claim is likely to succeed on the merits.[9]

     2. Likelihood of Success on the Standing Issues.

The Court is mindful that to succeed on the merits at trial, the plaintiffs will bear the burden of proving their standing to sue in addition to the unlawfulness of the defendants' practices, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and that a plaintiff's likelihood of successfully showing standing is properly considered as part of the overall analysis of the likelihood of success on the merits, *see N.E. Ohio Coalition for Homeless & Serv. Employees Int'l Union v. Blackwell*, 467 F. 3d 999, 1010 (6th Cir. 2006) ("The weakness of plaintiffs' showing of standing leads us to conclude that their likelihood of

---

[8] Even if every out of state driver's license applicant were to have moved out of Michigan for voting purposes, the NVRA would still clearly forbid the Secretary from regarding their applications as evidence of that fact if the applicants had designated otherwise. In this case, though, regardless of any NVRA violation, the plaintiffs would have no standing to sue because there could be no supportable allegation of harm since no voter would have been wrongfully disenfranchised.

[9] There is, accordingly, no need to consider the plaintiffs' other challenges to the driver's license practice.

success on the merits is not strong.") The Court will now analyze whether the plaintiffs are likely to succeed on the merits of the standing issues in this case.

a. Undeliverable ID practice.

As the Court noted previously, to establish representational standing in this case, the plaintiffs will eventually have to prove that at least one of their members actually has suffered or is at risk of suffering wrongful disenfranchisement as a result of the complained of practices. Since plaintiffs plead that they have a total Michigan membership of over 20,000, it appears likely that they will be able to produce one or more members who have registered recently enough that they are still in doubt as to whether their registration will be wrongfully cancelled as a result of their ID being mistakenly returned as undeliverable. The Court has already determined that exposure to such a risk from the actions in question here is sufficient to confer standing. Thus, considering the lawfulness and standing prongs together, the Court finds that plaintiffs have a very strong likelihood of succeeding on the merits of their challenge to the undeliverable voter ID practice.

b. Out of state driver's license application practice.

The plaintiffs' standing to challenge the out of state driver's license application practice is in more serious doubt. As the Court noted above, the voters placed at risk of disenfranchisement by this practice appears quite narrow.

The Court believes there to be three characteristics common to all the members of this group: (1) they have applied or plan to apply for a driver's license in a state other than Michigan; (2) they have designated or plan on designating that their address on their application is not for voter-registration purposes; and (3) they have been or will actually be eligible to vote in Michigan in at least one election after their registrations were or will be

cancelled.[10]  Since the Court regards it to be nearly impossible for a Michigan resident to inadvertently apply for a driver's license in another state, persons not in this  group face no risk of wrongful disenfranchisement from the driver's license practice, and thus they have no standing to challenge it.

The Court is considerably less confident that one of the plaintiffs' members will prove to have these characteristics than that one of their members has recently registered to vote, as is required for standing to challenge the undeliverable ID practice.  The Secretary informed the Court both in her brief and at the hearing in this matter that she receives notice of about 72,000 out of state driver's license applications every year.[11]  At the hearing, the Court directly questioned counsel for both sides as to how many out of state drivers license applicants indicate that the address on their applications are not for voting purposes, and whether they are legally correct in so indicating.  Their responses made it apparent to the Court that neither side can present, because no data whatever exists, any evidence or other information that would allow the Court or any other finder of fact to answer these questions.

Furthermore, while -- for the reasons discussed previously -- the defendants' argument that most states permit only residents to apply to them for driver's licenses does not establish that the driver's license practice harms no one at all, it certainly does suggest strongly that the number of persons harmed by the practice may be small.  Although the residence requirement for driver's license purposes may be less stringent than that for voting purposes, it nevertheless undoubtedly deters many people who satisfy neither of

---

[10]  If a driver's license applicant has indicated that his or her change of address is not for voter registration purposes, then the Secretary's cancellation of his or her registration is a violation of the NVRA regardless of whether the voter actually remains eligible in Michigan.  Nevertheless, if the voter is *not* eligible in Michigan, then the voter has not suffered the harm of disenfranchisement and thus will lack standing to sue.

[11]  In their brief, the plaintiffs claimed that the number was approximately 280,000 per year, but at the hearing they conceded the correctness of the Secretary's figure.

them from applying for out of state driver's licenses-- and thus prevents them from having their Michigan voter registrations cancelled.

Thus, the Court finds that the only persons who are even *potentially* harmed by the driver's license practice are those who either applied for out of state driver's licenses (and surrendered their Michigan licenses) despite not meeting the residency requirement in the state of application, or who applied for a driver's license in states where they satisfied the residency requirement for receiving a driver's license, but not for voting. The Court therefore concludes that the number of voters who will be able to meet the injury in fact requirement for standing, while not zero, is likely to be correspondingly small. For the plaintiffs to be entitled to a permanent injunction on a theory of representative standing, they will have to show that at least one member of this group of people is also a member of one of their organizations. While it is certainly possible that they will be able to make such a showing, there has been no discovery or any other factual development on this issue in the case -- indeed, both parties affirmatively state that no facts or data exist to resolve the question -- and as a result the Court does not have any confidence that the plaintiffs will be able to do so. Thus, the plaintiffs' likelihood of success on the merits of the standing issues with regard to the driver's license practice can best be described at this juncture as questionable.

******

The Court's analysis of the standing issue should not be construed to mitigate what seems to be the clear unlawfulness of what the Secretary is doing with regard to out of state driver's license applications. But even if the outcome of the NVRA challenge were absolutely certain, plaintiffs' overall likelihood of success on the merits can be no greater than their likelihood of proving their standing. Thus, the plaintiffs' *overall* likelihood of success on the merits in the view of the Court is questionable.

B.  Irreparable Harm.

The injury threatened to their members that establishes the plaintiffs' representative standing is the deprivation of the right to vote.  Authorities are split on the issue of whether this type of alleged harm is irreparable *per se*.  *Compare, e.g., Williams v. Salerno*, 792 F. 2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon"), *with Chisom v. Roemer*, 853 F. 2d 1186, 1188-89 (5th Cir. 1988) ("We are not prepared to adopt a *per se* rule in such a vital area of federal-state relations.")  While the Sixth Circuit appears not to have decided the issue, even the leading case declining to adopt a *per se* rule, *Chisom*, was a decision on whether to enjoin an election for state office, and not whether to require a state to permit more persons to vote in a federal election.  *Chisom*, 853 F. 2d at 1189.  Even in that context, the 5th Circuit recognized that a preliminary injunction is appropriate "when the threatened harm would impair the court's ability to grant an effective remedy."  *Id.* (citation omitted).  In this case, where state sovereignty is not squarely implicated and a federal election is approaching rapidly enough that, according to the defendants, delaying the issuance of an injunction until close to the election date would risk organizational chaos in the Michigan Department of State, the Court finds that any disenfranchisement effected by the undeliverable ID or driver's license practices would indeed constitute irreparable harm.

Thus, the only consideration mitigating the strength of this factor in favor of an injunction is the possibility that the harm might not actually be suffered by any of the plaintiffs' members.  With respect to the practices at issue here, however, the irreparable harm inquiry diverges from the Court's analysis on standing because the plaintiffs' standing is predicated not on actual harm to their members, but rather on a risk of harm that may or may not occur in any individual case.  This possibility -- that the potential harm that confers

standing on the plaintiffs may not actually materialize with respect to any of their members -- is clearly relevant to the question of whether plaintiffs will suffer irreparable harm without a preliminary injunction. In this light, each of the practices will be analyzed in turn.

1. <u>The undeliverable ID practice</u>.

The plaintiffs have demonstrated a strong likelihood of proving *standing* to challenge the undeliverable ID practice because every eligible Michigan voter who registers is at risk of being stricken from the rolls until he or she actually receives an ID card. But, since only 1,500 registrants have been removed in this fashion this year-- as compared to more than 70,000 per year as a result of the driver's license practice-- only a very small fraction of the people who register actually suffer the harm of being removed from the rolls, and thus deprived of the right to vote.

Further, at the hearing held in this matter, the defendants stressed that a voter whose registration has been "rejected" pursuant to the undeliverable ID practice may nonetheless cast a regular ballot if he or she presents a receipt of registration at the polls. This obviously will prevent disenfranchisement, but only for those voters who bring receipts with them to the polls. Presentation of a receipt, however, is not required of other voters, and since many or most Michigan residents removed from the lists pursuant to the undeliverable ID practice will in reality not receive separate notice of removal, they will likely not even know that their registrations have been rejected, and thus will be unaware of the necessity of bringing their receipts to the polls even if they have in fact retained them. Further, the plaintiffs argue that voters who register by mail do not even receive receipts in the first place, and as a result, the number of disenfranchisements prevented by the possibility of presenting a voter registration receipt is likely to be small.

The defendants additionally argue that both the undeliverable ID practice includes the sending of a postage-prepaid, preaddressed reply card, which the voter can mail back and be restored to the rolls. While this additional practice will not cure the deficiency of the programs under the NVRA, if substantial numbers of eligible voters actually return cards it would reduce the number of persons who are harmed by the practices, and thus the likelihood that any of that group are members of the plaintiffs.

There are three possible objections to effectiveness of this practice. First, if the defendants' rationale for removing a voter from the rolls is that the voter does not live at the address they have on file, then mailing a notice to that address is a poor way of permitting the voter to clarify that the voter is still a permanent Michigan resident. It seems likely that even if they remain eligible Michigan voters, a substantial number of registrants will not receive the reply card, or at least not receive the card in time to return it, for the very same reasons that led the defendants to believe that they have abandoned their residences. Second, even if voters receive the reply cards, at least some of them will not fill them out (or not fill them out properly), and the NVRA does not permit Michigan from removing them based on their failure to do so. Finally, even voters who receive the cards and return them will have been wrongfully taken off the rolls until the date that their cards are processed and their registrations are reactivated. The combination of these three objections convinces the Court that, while this backup procedure reduces somewhat the likelihood that plaintiffs' members will be injured by these undeliverable ID practice, it by no means eliminates it.[12]

---

[12] The defendants also argue, in defense of both the undeliverable ID and driver's license practices, that because a voter whose name has been removed from the rolls can always cast a provisional ballot, no harm is done by the removal. Plaintiffs respond that under both federal and state law a voter's eligibility for purposes of counting a provisional ballot must be determined by the same standards as is her eligibility to cast a regular ballot. See 42 U.S.C. § 15482(a)(4); M.C.L. § 18.183. Thus, even if a voter who does not appear on the rolls is permitted to cast a provisional ballot, this only delays the inevitable disenfranchisement.

It is undisputed that more than one thousand voters have been disqualified so far in 2008 pursuant to the undeliverable ID practice. But neither side has provided the Court with any information as to how many of these disqualifications are actually wrongful. Plaintiffs argue that some simply *must* be wrongful, because human error in addressing and delivering voter IDs is inevitable, and the Court agrees with the plaintiffs' analysis. The Court, however, also regards the likely number of these errors to be small enough as to raise serious questions about whether the undeliverable ID practice will actually adversely affect any of plaintiffs' membership if a preliminary injunction is not entered. Overall, and based upon the analysis set forth here, the Court concludes that although the number of plaintiffs' members likely to be adversely affected by the practice is relatively low, these members face certain irreparable harm.

      2. The driver's license practice

The Court has already noted that the plaintiffs have only a questionable likelihood of proving their allegations of standing to challenge the driver's license practice, because of the low likelihood that one of the (probably) small number of Michigan voters harmed by the practice is a member of one of the plaintiffs. This alone would dictate a conclusion that any likelihood of irreparable harm to plaintiffs' members is insufficient to weigh in favor of a preliminary injunction. Additionally, the Court recognizes that the reply-card component of the driver's license practice, although subject to the same shortcomings identified in connection with the undeliverable ID reply cards, does provide some out of state driver's license applicants with the opportunity to reaffirm their Michigan residence and remain on the rolls. Again, this does not satisfy the NVRA, but it does provide some registrants the chance to avoid disenfranchisement, and thus likely decreases even further the number of persons who suffer irreparable harm as a result of the driver's license practice. For these

reasons, the Court is unable to conclude at this juncture that any plaintiffs' members are likely to suffer irreparable harm if a preliminary injunction is not entered against the driver's license practice.

C. <u>Balance of Hardships from Entry of an Injunction</u>.

The defendants argue that making the changes that the plaintiffs seek in their motion for preliminary injunction would impose serious administrative difficulties, especially if an injunction is entered close to the November, 2008 election. For instance, the defendants claim that the only method of restoring the active status of the cancelled registrants would, if implemented, also affect the registrations of anyone who first applied for a driver's license in another state and then re-registered in Michigan. These voters, according to the defendants, would see their QVF addresses revert to the ones that were current before their initial out of state driver's license application. If the Department of State is forced to deal with these and other difficulties -- not to mention the task of identifying which registrations are entitled to reactivation[13] -- the result, the defendants warn, could be their inability to deal with the other requirements of conducting a smooth election. The Court fully agrees with the State on this issue and makes what it regards a common sense conclusion that the logistical problems involved with restoring a large number voters to the rolls, as the plaintiffs request in their motion, are likely to be significant.

Plaintiffs contend, however, and rightly so in the judgment of the Court, that any hardship suffered by the state of Michigan and its officials as a result of the entry of the requested injunction would be largely self-imposed. Two reasons support the Court's conclusion: First, the NVRA language governing these practices is clear enough that the

---

[13] The defendants claim that this task would be nearly impossible. Because it also has significant implications for voter fraud, this claim and the reasons for it are discussed more fully below, with respect to its impact on the public interest.

defendants should have been on notice of the potential that they might be found unlawful -- as well as being on notice of the kind of remedial action that might be required in the event of such a finding. Second, at the hearing held in this matter, the plaintiffs represented -- without any sort of contest from the defendants -- that the plaintiffs explained their objections to these practices to the defendants as early as July, 2007, two months before the filing of this lawsuit. The counsel for the plaintiffs also asserted -- and the state of Michigan did not contest -- that no official from the state met with the plaintiffs to address, resolve, or even respond to their claims. Thus, the state defendants have actually had a considerable period of time in which to consider how to smoothly implement the sorts of relief the plaintiffs are asking for here. If the defendants have failed to undertake such considerations, any hardship faced by the defendants now is squarely attributable as much to the lack of preparation as to the actual changes the plaintiffs are asking for, and should be discounted accordingly.

As a result, the Court finds that the potential hardship to the defendants weighs only very slightly against the entry of a preliminary injunction. Additionally, the Court notes that due to the much larger potential number of voters who might have to be restored to comprehensively address the driver's license practice, coupled with the Court's lessened ability to determine how many voters will actually be harmed by the practice, this factor weighs somewhat more perceptibly against restoring those voters than it does for the voters affected by the undeliverable ID practice.

D. The Public Interest.

The defendants argue that the injunction requested by the plaintiffs here would harm the public interest by opening the door to voter fraud. This is true, they contend, is because Michigan's system has been set up on the premise that no one whose voter ID is

returned as undeliverable, or who applies for a driver's license in another state, is entitled to vote in Michigan. As a result, the state has no means of determining whether a registrant whose ID has been returned as undeliverable is actually a resident of Michigan, or whether an applicant for an out of state driver's license has designated, as permitted by the NVRA, that the application is not to be used for voting purposes. The Court will now examine the impact an injunction might have on the public interest in regard to each of Michigan's challenged practices.

      1.  <u>Undeliverable ID practice</u>.

The defendants' invocation of the public interest on the issue of undeliverable IDs amounts to an argument that the procedures required by the NVRA pose an unacceptable risk of fraud to the state of Michigan. The state is rightly concerned that some, and perhaps many, of the "rejected" voter registrations were fraudulent. Whatever the merits of that concern may be, however, in the context of the current litigation, the concern has been rejected by Congress when it enacted the terms of the NVRA.

"[T]he public has an interest in the enforcement of federal statutes." *Coxcom, Inc. v. Chaffee*, 536 F. 3d 101, 112 (1st Cir. 2008). Whether or not a person is actually entitled to vote in Michigan, the NVRA clearly requires that once a person is a "registrant" he or she may not be removed from the voter rolls except by operation of the procedures laid out in the Act. Although it might be desirable for the defendants to develop and implement other measures to remove ineligible voters from the rolls before they become NVRA "registrants", the defendants' acts in doing so -- whatever they may be -- are not a prerequisite to the NVRA's enforcement. Likewise, the fact that the defendants could have developed a lawful policy that would have removed some of the same registrations from the rolls does not detract substantially from the illegal manner in which each and every one of these removals

actually did occur.  The public interest cannot weigh heavily against restoring voters to the status that, given Michigan's current voter registration regime, those voters had been entitled to all along pursuant to the applicable federal law.

2. Driver's license practice.

With respect to the driver's license practice, the Court finds that the defendants' concerns carry more weight.  Because a great number of out of state driver's license applicants no doubt simultaneously register to vote (or decline to designate their change of address as being for voting purposes), many -- and perhaps most -- of the removals under this practice were perfectly lawful under the NVRA.  Since the parties have no way of knowing which applicants did what in this regard, however, the only way for the defendants to immediately restore any wrongfully-cancelled registrations, and to avoid any further wrongful cancellations, is apparently to undo *every* cancellation pursuant to the driver's license practice, and to stop entering any further cancellations pursuant thereto. The result would be returning to "active" status the registrations of up to 200,000 voters, an unknown but probably large number of whom were initially removed from the rolls in accordance with the NVRA in the first place and who are in fact no longer eligible to vote in Michigan.

Plaintiffs have offered no evidence contradicting these claims by defendants, but assert that if they are true, the burden of developing a method for avoiding the restoration of voters who are removable under the NVRA properly lies on the defendants.  This is very likely the case, but the Court cannot ignore the fact that the defendants' claimed inability to immediately develop such a method will have a significant impact on the public interest.

The public has an interest on both sides of this case.  On the one hand, there is undoubtedly a strong public interest in ensuring that all eligible voters are able to cast their

votes in an election. On the other hand, the public has a strong interest in the prevention of fraudulent voting as well.[14] A question exists as to whether the Secretary's practices at issue here removed more ineligible than eligible voters from the rolls, but in determining where the balance of the public interest lies the interests providing resolution to the question cannot be weighed against each other on a one-for-one basis. It seems likely that the portion of ineligible voters removed from the rolls who will attempt to vote after becoming ineligible is smaller than the portion of wrongfully-removed eligible voters who will show up at the polls, and so the public interest in removing ineligible voters must be discounted accordingly. Additionally, the harm from disenfranchisement is concrete and serious even if it occurs to only one individual, whereas the harms from fraudulent voting -- loss of public confidence in the election process and the risk of distorted outcomes -- are more diffuse, depending as much on the volume of fraudulent votes as on the fact that any one of them is being cast.[15]

The risk of fraudulent voting must nevertheless be a serious consideration in deciding whether to require the state to restore to active status (or refrain from cancelling in the first place) the registrations of some 200,000 voters, a great number of whom are likely not entitled to vote. As noted previously, neither side has provided any data relating to how many of the registrations cancelled pursuant to the driver's license procedure were those of eligible Michigan voters. On the record available at this preliminary stage, the Court concludes that this is likely to be quite a small portion of the cancellations, and

_____

[14] "Fraudulent" here refers both to active attempts to circumvent the election laws, and to situations in which a voter is simply mistaken as to which state he or she is eligible to vote in.

[15] Disenfranchisement of eligible voters also risks distorting election outcomes, though if one assumes that anti-fraud measures will prevent more fraudulent than legitimate votes, then such measures will still have a net effect of reducing rather than exacerbating these sorts of distortions.

consequently that the public interest in preventing the mass reactivation of ineligible voters is of significant weight.

Based on the foregoing, the Court draws slightly differing conclusions with respect to the impact on the public interest of the prohibitory and mandatory aspects of the relief from the driver's license practice requested by the plaintiffs. Currently, the Secretary is cancelling voter registrations based on out of state driver's license application, without even having before her the key piece of information necessary to determine whether the NVRA permits such removals; that is, whether the applicant has designated the change of address as not for voting purposes. This is unlawful, and the public policies in favor of preventing unlawful disenfranchisement and enforcing federal statutes clearly dictate that it be stopped. This would in no way obstruct the secretary's task of avoiding the harm to the public interest that would result from retaining ineligible voters on the rolls, since she has been and will remain free to adopt any method for doing so that is permitted by the NVRA.

With respect to cancellations that have already occurred, however, the NVRA has already been violated, and the only question is how that violation can be remedied in a manner most consistent with the public interest. Restoring voters who were *not* entitled under the NVRA to remain on the rolls is to be avoided if possible. Given the defendants' claims as to the information they have, a mass reactivation of the type requested by the plaintiffs would risk grave harm to the public interest by permitting a large number of ineligible voters to vote. Accordingly, the Court finds that this factor weighs rather strongly against the mandatory relief requested by plaintiffs.

IV.  Summary and Form of Relief

A.  The Undeliverable ID Practice.

As to the undeliverable ID practice, the Court concludes that the plaintiffs have made a strong showing of success on the merits and a substantial but not overly strong showing of irreparable harm.  The prohibitory injunction requested by the plaintiffs would work very little hardship on the defendants and would be in the public interest.  The mandatory injunction would result in some, mostly self-imposed, hardship for defendants, but entering the injunction would also serve the public interest by restoring the registrations of voters entitled under the NVRA to be on the rolls.  Accordingly, the Court will grant both prohibitory and mandatory injunctions with respect to the undeliverable ID practice.

A question remains as to the proper form of this relief.  While these registrants seem entitled under the NVRA to have their cancellations reversed, the defendants point out (and the plaintiffs do not dispute) that because their IDs were returned as undeliverable, there is reason to doubt whether some of them actually live in Michigan, and thus whether they are entitled to vote here.  This suggests that, after reversing the cancellations of these voters' registrations, it would be appropriate for the defendants to take additional steps to verify the Michigan residence of the voters before permitting them to vote.   They plaintiffs, however, briefly argue that both the Equal Protection Clause and a provision of the Civil Rights Act, codified at 42 U.S.C. § 1971(a)(2)(A), prohibit treating voters whose original IDs are returned as undeliverable any differently from those whose duplicate IDs are similarly returned.  Since a voter whose duplicate ID is returned as undeliverable is marked as "challenge" on the QVF, the plaintiffs seem to argue that this is the *only* step defendants should be permitted to take to verify the restored voters' residence.

The Court does not agree. The relevant portion of the Civil Rights Act prohibits the application of different "standards, practices or procedures" in determining whether any two citizens of a state are qualified to vote. This simply requires that if Michigan wishes to impose unique procedural requirements on the basis of a registrant's original voter ID being returned as undeliverable, it must impose those requirements on *everyone* whose original ID is returned as undeliverable. In the Court's view, the treatment of registrants whose other documents are similarly returned is simply irrelevant under the statute.[16] The Court likewise does not consider these requirements to be any sort of disparate treatment unrelated to a legitimate state interest, as the plaintiffs argue pursuant to their equal-protection claim. The Court makes a common sense conclusion that a person whose first ID card is returned as undeliverable to his or her registered address is less likely to actually reside at that address -- or anywhere else in Michigan -- than a person who has previously received an ID card at his or her Michigan address but now appears no longer to live there. Since the state certainly has an interest in preventing non-residents from voting within its borders, the state is therefore entitled to draw distinctions between these two different classes of persons.

As a result, the defendants need not treat voters whose original IDs are returned as undeliverable identically to any other class of voters. This Court's injunction will not prevent them from requiring of such voters whatever further proofs of residence may be necessary or permitted under state law and the NVRA. What the defendants must do, however, is

---

[16] There accordingly is no need to resolve the parties' dispute over whether this federal statute can be enforced through a private lawsuit under 28 U.S.C. § 1983, or only by the Attorney General. *Cf. McKay v. Thompson*, 226 F. 2d 752 (6th Cir. 2000) (holding that 42 U.S.C. § 1971(a) is not *directly* enforceable in a private action).

restore the cancelled registrations to some status that will not by itself, as their current status does, require the rejection of a ballot cast by these voters.

B. <u>The out of state driver's license application practice</u>.

With respect to the out of state driver's license application practice, the Court concludes that there is only a questionable likelihood that any of plaintiffs' members will suffer an injury in fact, and thus that plaintiffs have only a questionable likelihood of success on the merits on the issue of their standing to sue. This weak showing of injury also indicates a relatively low probability that plaintiffs' members will suffer irreparable harm without a preliminary injunction. A prohibitory injunction would involve some hardship to the defendants, and a mandatory injunction would involve considerably greater hardship, but both sets of hardships would be largely self-imposed. Finally, a prohibitory injunction would be in the public interest, but mandatorily enjoining the defendants on this issue would not.

Weighing these factors, a preliminary injunction against the driver's license practice is not appropriate on this record. Nevertheless, it bears repeating that this practice does appear to be in violation of the NVRA. Should the plaintiffs be able to shore up their standing in this case, it is the Court's hope that both sides will cooperate in developing a method by which any voters who have wrongfully had their registrations cancelled can be restored to the rolls, without resorting to a mass reactivation. After the defendants answer the complaint and the parties proceed through discovery, information and evidence from the state of Michigan should be able to bring light to the question of how the practice should be changed.

C. The Ypsilanti City Clerk.

A further word is appropriate to address the arguments of the City Clerk for the City of Ypsilanti, Michigan ("the clerk"). In a separate brief in response to this motion, the clerk claimed that because of staff and budget shortages she does not, and will not before the upcoming election, remove voter names from the rolls pursuant to the undeliverable ID practice.[17] If this is true, then the likelihood of irreparable harm to plaintiffs' members from the clerk would be reduced to minuscule proportions. The burden of an injunction on the clerk herself, however, would be correspondingly reduced, as would any impact on the public interest. The plaintiffs' strong likelihood of success on the merits would remain unchanged.

Since the Court's injunction against the other defendants will preclude them not only from personally marking voters' QVF entries with a disqualifying status, but also from directing or encouraging others to do so, the foregoing makes it unnecessary to enjoin the clerk from doing so as well. If the plaintiffs present the Court with information that her actions fail to correspond with her representations in her brief, however, such an injunction will promptly issue.

CONCLUSION

**WHEREFORE**, it is hereby **ORDERED** that the defendants Michigan Secretary of State and the Michigan Director of Elections:

---

[17] The clerk makes a much more convoluted argument with regard to the out of state driver's license application practice, but since the nature of the Court's relief will not entail the issuance of an injunction on that issue, the Court finds it unnecessary to address the clerk's arguments on the drivers license issue here.

(1)  Immediately discontinue their practice of cancelling or rejecting a voter's registration based upon the return of the voter's original voter identification card as undeliverable;

(2)  Remove the "rejected" marking in the QVF from the registrations of all voters whose original voter IDs have been returned as undeliverable since January 1, 2006 until the present, unless rejection was warranted for some other lawful reason;

(3)  Make no other designation, including but not limited to "cancelled," in these voters' registration records in the QVF or elsewhere, that will prevent their ballots from being counted if they appear at the polls and give whatever further proof of Michigan residence is required or permitted under applicable state and federal law; unless such a designation is warranted by written notice from the voter or for some reason other than change of residence;

(4)  Preserve and not destroy until after December 31, 2009, any and all records relating to maintenance of Michigan's voter registration files that have, since January 1, 2006, resulted in the cancellation of the registration of voters who have applied for out of state driver's licenses, or the cancellation or rejection of voters' registrations based upon the return of original voter identification cards ; and

(5)  Give no order, direction, or encouragement that any other government official or any other person engage in activity hereby prohibited to them.

It is further **ORDERED** that the defendants Michigan Secretary of State, the Michigan

Director of Elections, and the Ypsilanti City Clerk file an answer to the complaint in this

action no later than fourteen days from the date of this Order.


**SO ORDERED.**

                                    s/Stephen J. Murphy, III
                                    STEPHEN J. MURPHY, III
                                    United States District Judge

Dated: October 13, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on October 13, 2008, by electronic and/or ordinary mail.

                                    s/Alissa Greer
                                    Case Manager