| | |
|---|---|
| UNITED STATES STUDENT ASSOCIATION FOUNDATION, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, AMERICAN CIVIL LIBERTIES UNION OF MICHIGAN, and MICHIGAN STATE CONFERENCE OF NAACP BRANCHES,<br><br>        Plaintiffs,<br>v.<br><br>TERRI LYNN LAND, CHRISTOPHER M. THOMAS, and FRANCES MCMULLAN,<br><br>        Defendants.<br>_____/ | Case No. 08-cv-14019<br><br>HONORABLE STEPHEN J. MURPHY, III |

**OPINION AND ORDER DENYING DEFENDANTS'
MOTION TO DISMISS (docket no. 60), GRANTING PLAINTIFFS'
MOTION TO AMEND THE SCHEDULING ORDER (docket no. 65)**

On October 13, 2008, this Court granted, in part, Plaintiffs' request for a preliminary injunction. Pursuant to that order, Michigan's Secretary of State and Director of Elections were required to restore to the State's Qualified Voter File ("QVF") certain voters whose voting status in QVF was marked "rejected" after their voter identifications cards were returned as undeliverable, and to discontinue this marking practice going forward. The Court devoted a significant portion of its order to Plaintiffs' standing to challenge the State's practices, an issue raised by the parties in their briefing. Defendants now move to dismiss Plaintiffs' entire complaint for lack of standing. Although the Court and the Sixth Circuit have addressed Plaintiffs' standing in this case on three separate occasions, they have never done so in the context of a motion to dismiss. Also pending before the Court is

Plaintiffs' motion for an enlargement of time to complete discovery and modification of the scheduling order, which Defendants oppose.

For the reasons stated below, the Court will deny Defendants' motion to dismiss for lack of standing, without prejudice to raising the issue at the close of discovery. Although the Court seriously questions Plaintiffs' ability to prove their allegations of standing, the Court believes it unfair to hold Plaintiffs to a burden in that regard before the close of discovery. Also, because Plaintiffs have demonstrated good cause, the Court will grant Plaintiffs' motion for an extension of discovery and modification of the scheduling order. No more requests, however, to modify the scheduling order will be granted.

## DISCUSSION

The facts in this case are straight-forward and were set forth in the Court's lengthy opinion and order granting, in part, Plaintiffs' motion for a preliminary injunction. Order of October 13, 2008, at 2-5. The Court will not again describe in detail Defendants' voter registration and deregistration practices and the challenges by Plaintiffs thereto. Additional factual background, as necessary, is discussed below.

I. Legal Standards

   A. Federal Rule of Civil Procedure 12(b)(1)

Defendants move to dismiss the claims in the complaint pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction). Subject matter jurisdiction may be raised by the parties or the Court at any stage in the litigation, even after trial and the entry of judgment. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). Indeed, Rule 12(h)(3) of the Federal Rules of Civil Procedure instructs: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). In a factual attack, no presumptive truthfulness applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A district court has wide discretion to allow affidavits, documents, and even conduct an evidentiary hearing to resolve disputed jurisdictional facts. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Defendants here mount a factual attack.

B. Article III Standing

A federal district court's subject matter jurisdiction is limited by Article III of the U.S. Constitution to actual "Cases" or "Controversies." U.S. Const. art III, § 2. Indeed, " '[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " *DiamlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). One element of the case or controversy requirement is that the plaintiff establish it has standing to sue. *Raines*, 521 U.S. at 818. If a plaintiff cannot establish its standing, the claims must be dismissed for lack of subject matter jurisdiction. *Loren v. Blue Cross & Blue Shield*, 505 F.3d 598, 607 (6th Cir. 2007).

"To satisfy Article III's standing requirements, a plaintiff must show : '(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

3

redressed by a favorable decision.'" *Cleveland Branch NAACP v. City of Parma*, 263 F.3d 513, 523-24 (6th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)).

Article III's standing requirements apply to associations or groups as well as to natural persons. An association may have standing to sue in two ways. First, "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Am Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 544 (6th Cir. 2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). That is, an association may have standing to assert an injury to itself regardless of whether its members also have standing. *Id.* Second, an association may have standing to sue as a representative of its members. *Id.* at 541. Representative standing is satisfied when an association's "'members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* at 540 (quoting *Friends of the Earth*, 528 U.S. at 181).

II. <u>Defendants' Instant Challenges to Plaintiffs' Standing</u>

In their instant motion to dismiss, Defendants again challenge Plaintiffs' standing to sue to remedy Defendants' alleged violations of the National Voter Registration Act ("NVRA"). Defendants make three arguments for why the Court should dismiss the claims for lack of standing. First, they argue that two of the four plaintiffs, United States Student Association Foundation ("USSAF") and ACLU Fund of Michigan ("ACLU Fund"), lack standing in a representative capacity because neither association consists of members who vote and face potential disenfranchisement by Michigan's voting registration and

4

deregistration procedures. Second, they argue that the other two plaintiffs, ACLU of Michigan ("ACLU") and Michigan Conference of NAACP Branches ("NAACP"), lack standing because although they represent members who vote, they have failed to identify any members who has been or will likely be affected by either of the two challenged practices.

The third argument Defendants make is essentially a reiteration of an argument they made (and the Court considered and rejected) on two occasions. Defendants argue that even if the ACLU and NAACP can identify members who had voter registrations canceled or denied based on an undeliverable voter ID card or an out of state driver's license application, such members do not face disenfranchisement because they can still cast provisional ballots which will be counted. Defendants assert that the Court's prior rejection of this argument was based on the misunderstanding that the provisional ballots would not count. The Court considers this argument to be complicated and potentially moot in light of the analysis of authorities on the first two arguments. In the event Plaintiffs are eventually able to identify members who face a risk of disenfranchisement as a result of the challenged practices, the Court will consider Defendants' provisional ballot argument insofar as it mitigates the injury alleged by Plaintiffs, i.e., disenfranchisement.[1]

A. <u>Law of the Case Doctrine Does Not Bar Defendants' Motion</u>

In response to Defendants' motion to dismiss, Plaintiffs argue that Defendants' standing arguments are barred by the law of the case doctrine. They argue that since the

---

[1] Defendants appear to agree with the Court's approach in this regard. In their reply brief, rather than rebutting Plaintiffs' responsive arguments, Defendants state, "until Plaintiffs are able to identify impacted members, it is unnecessary to resolve the factual and legal disputes relating to the provisional ballot process, and how that process protects any members from unlawful disenfranchisement." Def. Reply. Br. at 5.

5

Court already determined at the preliminary injunction stage that Plaintiffs have standing to challenge the voting practices on behalf of their members, the Court is bound by that finding throughout the rest of the proceedings. They also assert that the Sixth Circuit's finding that Plaintiffs have standing, in the context of affirming the Court's denial of a stay, prohibits the Court from disturbing that finding. The Court disagrees with Plaintiffs' assertion that this Court is forever bound by its standing determination made at the preliminary injunction phase of the case.

This law of the case doctrine precludes reconsideration of an issue already decided in a previous stage of litigation, either explicitly or by necessary inference from the disposition. *McKenzie v. BellSouth Telecomms.*, 219 F.3d 508, 513 (6th Cir. 2000). Findings made at one point in the case are binding on future rulings of the court absent substantially different evidence, change in controlling law, clear error, or manifest injustice. *Id.* at 513 n. 3. The doctrine is most applicable when the court declares a rule of law at one stage in the proceeding that should continue to govern the same issues in subsequent stages in the same case. *Arizona v. California*, 460 U.S. 605, 618 (1983). Thus, a finding on a motion to dismiss would not establish the law of the case for purposes of summary judgment when the complaint has been supplemented by further factual development and discovery. *McKenzie,* 219 F.3d at 513. The same applies to a court's factual finding and conclusions of law in a preliminary injunction setting. That is, a court's findings and conclusions in the earlier proceeding would not bind the same court in a trial on the merits. *See Certified Restoration Dry Cleaning Network L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *William G. Wilcox, D.O., P.C. Employees' Defined Benefit Pension Trust v. United States*, 888 F.2d 1111, 1114 (6th Cir.1989).

The law of the case doctrine does not apply to bar Defendants' motion to dismiss for lack of standing. The fact that the Court has twice concluded, after considering *only* the allegations in the complaint, that Plaintiffs have standing to challenge Defendants' practices at the preliminary injunction stage, does not preclude Defendants from challenging Plaintiffs' standing at a later stage, when a different level of proof is required. At the preliminary injunction stage, there was no factual record and the Court considered only the allegations in the complaint and reasonable inferences therefrom. The case is now in a different posture. The parties have engaged in extensive discovery, facts have come to light, and legal arguments and theories have been refined. Indeed, in granting Plaintiffs' preliminary injunction motion, the Court expressly contemplated that it would again -- and more exhaustively -- address the issue of Plaintiffs' standing when it declared: "[s]hould this case progress to trial, [Plaintiffs] will bear the additional burden of proving what they have pleaded in order to conclusively establish their standing to sue." Order of October 13, 2008, at 15. Accordingly, the Court concludes that the law of the case doctrine does not apply here to bar the Court from considering Defendants' challenge to Plaintiffs' standing to sue.

B. <u>Challenge to USSAF and ACLU Fund's Standing</u>

Defendants have challenged the ability of USSAF and ACLU Fund to sue in a representative capacity on behalf of their members. As stated above, for an association to have standing to assert the claims of their members, the association must demonstrate, among other things, that its members would otherwise have standing to sue in their own

right.[2]  This means that the members of the associations themselves must have suffered or be likely to suffer in the future some concrete injury in fact.

The Court's order issuing a preliminary injunction addressed Plaintiffs' representative standing and determined the allegations in the complaint, along with the logical implications of those allegations, were sufficient -- "just barely" -- to satisfy the standing requirement of injury in fact.  Order of October 13, 2008, at 13.  Supporting its conclusion was the Court's recognition that Plaintiffs had pleaded in paragraphs 74 and 89[3] the existence of persons harmed or likely to be harmed by Defendants' practices.  Even though the allegations were conclusory, the Court determined that "in light of the other allegations, and  'constru[ing] the complaint in favor of the complaining party,'  the facts required for standing follow from these claims by necessary implication."  *Id.* at 12-13 (citation omitted).

Defendants argue in the instant motion that the Court's assumption that USSAF and ACLU Fund actually had members, though perhaps excusable when addressing standing at the preliminary injunction stage where no facts were presented, is, in fact, incorrect in light of further discovery.  The discovery demonstrates that these two organizations have *no* members who vote in elections, which would allow the organizations to assert claims on their behalf.  Defendants assert that according to the United States Student Association ("USSA") website and promotional materials, USSAF is USSA's section 501(c)(3) tax-exempt sister organization.  USSAF, run by a board of directors, provides educational and

---

[2] Although an association may also sue in its own right, the Court has already noted that the allegations in the complaint of injury to the plaintiff associations themselves, even if proved, were insufficient to support standing on a theory of injury to the organizations themselves.  Order of October 13, 2008, at 11-12.  The complaint has not been amended to include allegations of injury of a more specific and concrete nature.  Moreover, in the briefing on the instant motion, none of the parties raise the issue of organizational standing, but rather proceed to argue the theory of representational standing.

[3] Formerly 73 and 88 in the original complaint.

training opportunities to student leaders. USSA's membership consists of a coalition of student governments and student associations from campuses around the nation. Thus, USSA has member campuses and student governments at those campuses, but no actual individual members, and *USSAF* has no members at all. The same is apparently true of ACLU Fund, the tax-exempt sister organization of Plaintiff ACLU of Michigan. Unlike ACLU, the ACLU *Fund* is not composed of individual members who vote. Accordingly, Defendants argue, USSAF and ACLU Fund have no individual members who have been or will be denied NVRA safeguards so the organizations have no standing to sue in a representative capacity.

Plaintiffs agree that USSAF and ACLU Fund have no individual "members" in the traditional sense. They claim, however, that the Supreme Court has made clear that non-membership organizations, such as USSAF and ACLU Fund, may nevertheless assert representational standing because they claim injury to their "non-member constituency." Plaintiffs cite *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) for support of this claim.

In *Hunt*, the Supreme Court considered a challenge to North Carolina's requirement that all apples sold, offered for sale, or shipped into the state in closed containers could bear only the applicable U.S. grade or standard of the applies on the outside of the shipping crate. *Id.* at 339. This requirement prohibited the Washington State Apple Advertising Commission ("Commission"), a state agency, from tagging its apple crates bound for North Carolina with Washington State's grade indicating a Washington origin. *Id.* The Court upheld the Commission's standing despite its formal status as a state agency, rather than a traditional voluntary membership organization. That status did not preclude the

Commission from asserting the claims of the Washington apple growers and dealers forming its constituency. *Id.* at 344.

The Court in *Hunt* adopted a functional approach to representative standing, considering the nature of the agency and its constituents to determine whether the Commission's constituencies were the functional equivalent of members. *Id.* at 344-45. It found that the Commission, for all practical purposes, performed the functions of a traditional trade association representing Washington's apple industry. The Commission's primary purpose was to promote and protect the state's apple industry. Through its market research and analysis, public education campaigns, and scientific research, the Commission served a specialized segment of Washington's economic community, the primary beneficiary of its activities. *Id.* at 344.

Considering the Commission's constituency, the Court found that although the apple growers and dealers were not "members" of the Commission in the traditional sense, they nevertheless possessed "all of the indicia of membership in an organization." *Id.* The growers and dealers alone elected members of the Commission and financed its activities through assessments they levied upon themselves. *Id.* at 344-45. The Court concluded that "[i]n a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id.* at 345.

The Court ended its analysis by recognizing that the interests of the Commission itself could be adversely affected by the outcome of the litigation. The annual assessments paid to the Commission were tied to the volume of apples grown and packaged as "Washington Apples," a title no longer permitted to be placed on the apple crates. The prohibition would likely reduce apple sales and assessments due the Commission by growers and dealers.

*Id.* The Court recognized that the financial nexus between the interests of the Commission and its constituents added to the weight of the other factors to "assure [the] concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Id.* (quotations omitted).

Plaintiffs here assert that *Hunt* is "clearly controlling legal authority" and chastize Defendants for not citing and attempting to distinguish it. USSAF and ACLU Fund assert that they, like the Commission in *Hunt*, serve their respective constituencies impacted by Defendants' practices. USSAF and ACLU Fund do not provide much factual support for these contentions, except to assert that both are involved in voter empowerment initiatives. USSAF organizes get-out-the-vote activities at six universities in Michigan and ACLU Fund organizes initiatives including "voter education, collection and analysis of voting irregularities, [and] advocacy for positive election reform." Pl. Resp. Br. at 10.

USSAF and ACLU Fund's invocation of *Hunt* is not sufficient, by itself, to conclusively establish USSAF and ACLU Fund's representational standing. The Court does not read *Hunt* as signaling a ground-breaking change in the area of representative standing jurisprudence. Most decisions from courts in the Sixth Circuit cite *Hunt* simply for the proposition that an association may sue on behalf of its members when the members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit, i.e., the general rule for representative standing. *Hunt* itself began with this general proposition, established before it in *Warth v. Seldin*, 422 U.S. 490 (1975). *Id.* at 343. *Hunt's* relevance comes simply from its recognition that courts should take a functional approach in deciding whether an organization may sue in a representative capacity. *Hunt* recognized that the

11

only question presented before it was whether the Commission's technical status as a state agency, rather than a traditional voluntary membership organization, precluded it from asserting the claims of the apple growers and dealers who formed its constituency. *Id.* at 345. *Hunt* refused to place form over substance and the Court there found that the Commission was essentially an association of members with real interests represented primarily by the Commission. *Id.*

In light of *Hunt's* functional approach to representative standing, the question for the Court in the present case is whether, in substance, the relationship between USSAF and ACLU Fund and their "non-member constituencies" is sufficiently close and similar enough to the relationship between the Commission and the apple growers and dealers in *Hunt* to allow USSAF and ACLU Fund to sue on behalf of their constituencies. The Court concludes that the record at this juncture is inadequate to determine the answer. The nature of the organizations and whether the constituencies of USSAF and ACLU Fund possess sufficient indicia of membership in the organizations are inquiries that require further record development.[4] The Court is unaware of the structure and purpose of USSAF and ACLU Fund, the nature of their constituencies, and the relationship between the organizations and their respective constituencies. Furthermore, Plaintiffs and Defendants each devote less than one page of their respective briefs to the relationship between USSAF and ACLU Fund vis-á-vis their constituencies. *See* Def. Br. at 13-14; Pl. Resp. Br.

---

[4] The Court is not suggesting the parties engage in extensive factual discovery regarding the nature of USSAF and ACLU Fund as organizations. Further factual development could take the form, for example, of affidavits, promotional materials, secretary of state filings, and the like. To be sure, Defendants did submit pages from USSA's website that briefly discuss the nature of USSAF, and the Articles of Incorporation for the ACLU Fund, but the Court finds these documents insufficient to allow the Court to determine the question at issue, particularly in light of the blanket citations to the attached exhibits.

at 10-11. The underdeveloped factual record and the cursory nature of the briefing on the issue do not allow the Court to provide a well-reasoned analysis on the issue, and the Court will not attempt to do so without more assistance and argument from the parties.

The Court, therefore, will deny Defendants' motion to dismiss USSAF and ACLU Fund from case for lack of standing. Defendants are permitted to again raise the issue at or before trial. As part of their burden of demonstrating standing, USSAF and ACLU Fund will ultimately have the burden of persuading the Court, based on evidence and argument, that they warrant treatment similar to the Commission in *Hunt*, and should be allowed to assert the claims of their constituents. As the Supreme Court did in *Hunt*, the Court here will then consider the nature of the organizations themselves and their constituents, as well as the relationship between them to determine whether the relationship justifies treating them like membership organizations even though they are not. If the Court determines USSAF and ACLU Fund are essentially membership organizations representing their constituencies, the organizations must then identify concrete injury to a constituent, as discussed below.

C. Challenge to ACLU of Michigan and NAACP's Standing

Defendants also argue that ACLU and NAACP lack standing because they have not identified a single member of each organization who has been injured or is likely to be injured in the future by Defendants' practices. Defendants assert that ACLU's website and other resources provide ample opportunity for it to search for members who have been or are likely to be impacted by the practices. The NAACP also had an opportunity to identify any injured members, but has not done do. Defendants conclude that Plaintiffs' failure to identify impacted members is fatal to their case and must result in dismissal of their claims for lack of standing.

13

Plaintiffs respond with a bifurcated argument distinguishing their burden between the prospective and retrospective relief they seek. First, with respect to the retrospective relief they seek (requiring Defendants to remove the "cancelled," "challenged," or "rejected" markings from the QVF for those impacted by the state's practices), Plaintiffs initially argued in their brief that they need not identify any specific members or constituents who have wrongfully been denied the right to vote. Pl. Resp. Br. at 12. At the hearing on Defendants' motion, however, counsel for Plaintiffs retreated from this view and conceded that with respect to the *retrospective* relief they seek, they *will* be required to identify at least one member who have been impacted by the challenged procedures. Hr'g Tr. at 18.

The question then becomes: when must Plaintiffs meet their burden? Plaintiffs claim that Defendants have repeatedly blocked access to information that would allow Plaintiffs to identify impacted members. The Court does not take sides in this discovery dispute, but notes that to the extent Plaintiffs are still in need of relevant and discoverable information, they should have the opportunity to receive and review it before being put to their proofs. The Court will wait until discovery is complete before requiring Plaintiffs to identify impacted members. Plaintiffs' failure to identify members, however, will result in dismissal of Plaintiffs claims for lack of standing. Defendants are free to raise the issue again, provided the record is complete and no further discovery is required.

With respect to their request for prospective relief, however, Plaintiffs claim that they are *never* required to identify specific members or constituents who have been harmed by the practices. They claim that the threat of such future harm to Plaintiffs' members and constituents, by itself, is sufficient to establish standing. Pl. Resp. Br. at 11; Hr'g Tr. at 19. They cite to *Sandusky County Dem. Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004), wherein a Sixth Circuit panel upholding a district court's issuance of a preliminary injunction

held that the failure of the plaintiff organization to identify specific members who might be disenfranchised due to human error at the polls was not fatal to the plaintiff's standing to challenge Ohio's voting requirements. *Id.* at 574. It concluded the plaintiff had standing at the preliminary injunction stage based on an increased risk of disenfranchisement faced by all members as a result of the inevitable mistakes of poll workers. *Id.* at 574.

This Court, in its order issuing the preliminary injunction, recognized *Sandusky* and addressed the nature of Plaintiffs' ultimate burden of proving standing to challenge Defendants' practices. It stated, "the plaintiffs will eventually have to prove that at least one of their members actually has suffered or is at risk of suffering wrongful disenfranchisement as a result of the complained of practices." Order of October 13, 2008, at 25. Essential to the Court's conclusion that Plaintiffs were likely to succeed in their challenge to the undeliverable voter ID practice was the prediction that with approximately 20,000 members in Michigan, it was likely that Plaintiffs would later be able to produce one or more members that had submitted a voter application and was at risk of having their registration wrongfully rejected as a result of a mistake in mailing the original voter ID card. *Id.*

Likewise, essential to the Court's conclusion that Plaintiffs were not likely to succeed in their challenge to the out of state driver's license application practice was the prediction that Plaintiffs would be unable to identify at least one member impacted by the practice. *Id.* at 27. The Court identified those members potentially impacted by the practice as follows: "those who either applied for out of state driver's licenses (and surrendered their Michigan licences) despite not meeting the residency requirement in the state of application, or who applied for a driver's license in states where they satisfied the residency requirement for receiving a driver's license, but not for voting." *Id.* at 27. The Court held that despite its belief that the Secretary's practice violated the NVRA, Plaintiffs were not

15

likely to ultimately succeed on their claim because it was unlikely they would be able to identify any member harmed by the practice. *Id.* It made clear that to be entitled to a permanent injunction on a theory of representative standing, Plaintiffs would have to show that at least one member of the group of people described above is also a member of one of their organizations. *Id.* With respect to both challenged practices, then, the Court contemplated Plaintiffs' ultimate burden of identifying at least one member of their organizations that had been or was likely to be impacted by the challenged practices, including an increased risk of disenfranchisement from the challenged practices. The Court intends to hold Plaintiffs to that burden.

In the end, to prevail on the merits, Plaintiffs will have to establish a "real," "imminent," and "inevitable" injury to their members as a result of this procedure. *Cf. N.E. Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2007) ("And neither *Sandusky County* nor any other case suggests that standing can exist in the absence of injury."); *id.* at 1012-13 (McKeague, J. concurring) ("*Sandusky* stands for the proposition that political parties and labor organizations have standing to assert the rights of their members where injury to members, albeit unidentified, was shown to be not speculative or remote, but "real," "imminent" and "inevitable."). This injury may include the risk of disenfranchisement so long as the risk is real. Bald assertions of unspecified injury, unsupported by evidence, while potentially sufficient at the pleading stage to establish standing, will not suffice at the trial stage. *See Summers v. Earth Island Inst.*, --- U.S. ----, 129 S. Ct. 1142, 1152 (2009) ("Standing . . . is not an ingenious academic exercise in the conceivable, but requires a factual showing of perceptible harm.") (internal alterations and citations omitted). A showing of a concrete, particularized, and imminent harm will be required.

The Court will not now hold Plaintiffs to their ultimate burden of proving standing because they assert they are in need of further discovery from Defendants. If, at or before trial, Plaintiffs are unable to identify any such injury in fact, the Court will have no choice but to dismiss the case.

For the foregoing reasons, the Court will deny Defendants' motion to dismiss.

## CONCLUSION AND ORDER

The Court concludes that the law of the case doctrine does not bar Defendants' challenge to Plaintiffs' standing. Defendants' motion as it relates to USSAF and ACLU Fund is denied. The Court requires further factual development and argument regarding the nature and structure of these organizations and the relationship they share with their constituents to determine whether they should be treated as representative organizations for purposes of representative standing. Defendants' motion as it relates to ACLU and NAACP is also denied as Plaintiffs require further discovery to attempt to prove their standing. Finally, as the Court indicated at the hearing, it will grant Plaintiffs' request to extend discovery and will amend the scheduling order as stated below.

Finally, the Court encourages the parties, to the extent possible, to work together to reach a solution that allays the legitimate fears of disenfranchisement harbored by Plaintiffs. The Court echoes the sentiments of the Sixth Circuit panel in *Sandusky* in noting that an amicable resolution of this dispute is far preferable to drawn out litigation that disrupts the electoral process and drains resources of an already belabored economy. *See Sandusky*, 467 F.3d at 1011 n. 3. The Court would be more than willing to assist in any way possible to reach a resolution.

**WHEREFORE**, it is hereby **ORDERED** that:

- Defendants' motion to dismiss for lack of standing (docket no. 60) is **DENIED.**

- Plaintiff's motion for order extending discovery and modifying the scheduling order (docket no. 65) is **GRANTED.** The following dates shall govern the proceedings:

    Close of discovery: **April 16, 2010**
    Dispositive motions due by: **May 21, 2010**
    Joint Final Pretrial Order due by: **September 22, 2010**
    Final Pretrial Conference: **September 29, 2010; 2:00 p.m.**
    Bench Trial: **October 5, 2010; 9:00 a.m.**

**SO ORDERED.**


                    s/Stephen J. Murphy, III
                    STEPHEN J. MURPHY, III
                    United States District Judge

Dated:  March 23, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 23, 2010, by electronic and/or ordinary mail.

                    s/Alissa Greer
                    Case Manager